It's been six years since the complaint in this case was filed, and the court below has yet to reach the merits of the underlying dispute. The government has now filed its third motion to dismiss, this time espousing a theory that's based upon a case that's been extant for over 85 years. It never raised the case before, and yet here we are on our second appeal before this court. Your honors, I think rarely before have I been involved in a case where the axiom of justice delayed is justice denied applies. I say that as background because here we are in a case, a Fifth Amendment takings case, and the court in denying the case this time has simply applied the wrong standard. This is a Rule 12 motion to dismiss, and yet by the court's own words, in its decision below applied a Rule 56 standard, yet my client in six years has never had the opportunity to present evidence to support its claim. Well, what is the test for a 12D6 motion, counsel? It is the test that this court espoused in its last decision remanding the case, where it said that the allegations in the complaint viewed most favorably to the plaintiff. Does it prove the case? And this court, in its earlier decision, determined that the complaint alleges a takings case under the Fifth Amendment that was part and parcel of this court's earlier decision. That was the decision of- But you would agree, I assume, that it's not just the facial allegations. It's the well-pleaded allegations. That's correct, Your Honor. But the court- So that part of what we have to do is look at the interstices, if you will, the what's said, implied, suggested in the complaint, not just the few words that are in the complaint. You would agree with that? I don't dispute that, Your Honor. But again, the court reached conclusions- How do you buy the omni-aligna cases that says the government can frustrate contracts without taking them? I don't disagree with that. It's inapplicable. We are not alleging that a contract was taken here, Your Honor. We're alleging that the underlying property was taken here, which is contrary to omnia. What was the property, then? The property were the enforced policies. The actual policies that my client owned had a property interest in were taken. But hold it right there, because you and the government both talk about policies as if a policy is a piece of paper, right? Is it your argument that somebody came in and literally picked up the pieces of paper and walked away with it, and the name of that person was the government? Aren't you really talking about contract rights? There are different contract rights, Your Honor. Let's distinguish. There is the contract right that the government said was taken, which was the contract between rain and hail and acceptance. They're saying that is what acceptance is alleging was taken. That's not what we're alleging was taken. We are alleging- Let's not talk about the policies. Let's not use that word. Can we agree on that for the moment? Let's talk about whose contract rights are you alleging were being taken, which contract rights as between which of the- This is a three-party operation. Somebody's contract rights, you're saying, were taken. I want to understand whose contract rights were taken. We are not alleging that a contract right was taken, Your Honor. That is the government's latest theory. You can't allege that the pieces of paper, the policies, were taken because nobody took your policies. No more than the house is represented by a deed. The deed is not the house. The deed is just a piece of paper. No one took the deed. Nobody takes deeds. But again, they transferred the policies to other insurance providers. They transferred the contract. They transferred the contract right. Whose contract rights were they transferring? Your Honor, I disagree with the characterization of contract right. It's an intangible property right that's represented by a piece of paper, but it's an intangible property right, no different than any other intangible property. Whose property right? Yeah. What was the intangible piece of property right that was taken? It is the enforced policies that were, in effect, that insurance had a property interest in. They got premium for their policies. They provided coverage. They were enforced for a certain period of time. As a consequence of the government's action, acceptance no longer had its property interest. It was divested. It was transferred to other insurance providers. Did the United States government take those policies away from your assurance corporation? Two answers. The simple answer is yes. And two... Help me out. How can you answer that yes? Because as a consequence of the blocked sale... So they didn't take them? Oh, physically. I'm sorry, if you meant physically, did they physically take them and then hand them to someone else? No, they didn't physically take them. So we're into the regulatory taking for it. That's correct, Your Honor. That is correct. I'm still hearing you describe this as an Omnia type case. I'm saying it's not an Omnia case at all. But it seems it is. The government is frustrated. Your contract, it wasn't even a contract, was it? It was a series of negotiations with rain and hail. And the government frustrates that. Please tell me how that deprived you of any property interest. That's not the taking. The taking is the frustration of saying, we will not approve the sale. And as a consequence, the policies are then transferred to other crop insurance providers. It's not simply in isolation. You can't simply slice and dice it that way and say, well, there was a contract here. Your Honor, Omnia would apply in this case. I suggest the government's argument would be stronger if I were representing rain and hail. And rain and hail were here saying, as a consequence of the government's actions, I, rain and hail, could not purchase the contracts that I wanted to purchase. Therefore, I have lost out. You say all you had was an expectancy in the acquisition of those policies. And your expectancy was frustrated. What did insurance have that was more than that expectancy? They actually had the policies. They owned the policies. But we've all agreed the government didn't take those policies. They did not physically take the piece of paper and say, here, it goes to here. They put into process the process that led to those policies being transferred. It is a regulatory taking in that sense. They frustrated things. But that's Omnia. No, no. It would be Omnia, again, if rain and hail were here saying, I couldn't acquire what I wanted to acquire. It seems to me you're a step further away than rain and hail. Oh, I think we are a step closer than rain and hail, Your Honor, with all due respect. We actually had the property. It was our property. It was acceptance's property. They had the vested property interest in those insurance contracts. They didn't have merely an expectancy in them. They had them. They didn't take that property. They certainly did, Your Honor, through the regulatory process by saying, to acceptance, you may not sell those policies to rain and hail. And as a consequence, those policies are then going to be redistributed to the other insurance providers. What was the authority under which the government said, you may not transfer those contract rights to rain and hail? You, acceptance, own a body of contract rights that come out of the fact that you promised farmers you would pay them money if certain things happened, and the farmers are going to pay you premiums. Actually, it's the government that pays the premiums, but that's besides the point. So there was a contract between acceptance and the farmers, right? Yes. And you owned those contract rights, and you wanted to convey those contract rights to rain and hail, and the government says, you can't do that. We won't approve it. What was the basis for the government's authority to say that? The government's plenary authority to regulate the crop insurance industry as demonstrated by section 6933 of the Federal Crop Insurance Act, which gives it the authority to regulate. But only if you have a contract with the government saying that we want you, government, to re-insure our contracts. Isn't that right? You had a second contract with the government. A second contract did exist, Your Honor, but again, the government did create the expectation and acceptance. Hold on. Let me just take it one step at a time. So acceptance has a second contract with the United States government and says, if you, United States government, will re-insure our losses, then we'll comply with your rules and regulations. Isn't that part of your contract with RMA? It was part and parcel of the contract with RMA under the SBA. With RMA under that, unfortunately, neither you nor the government bothered to give us any real information about what the standard re-insurance contract looked like. Because it's not applicable at this point, Your Honor. Well, I'm not sure it isn't because is it the case that in your contract with RMA, your re-insurance contract, the government reserved the right to approve assignments of your contract rights with the farmers? No, Your Honor, that's not correct. That section 4C9 of the standard re-insurance agreement is simply inapplicable in this situation. That section applies when and only when a farmer wants to change his insurance provider. It does not apply and does not address at all the situation here where there's been a bulk transfer, a proposed bulk transfer. Well, then what was the government's authority? Why did either you or rain and hail bother listening to the government if it had no authority to say you can't transfer to rain and hail? We believe that they did have the authority to regulate the crop insurance industry and then exercised that regulatory right. This is a case where... Where did they get the authority? Again, we think it's under their general plenary authority under 6933 of the federal crop insurance. To regulate the crop insurance industry. So the government, you're saying, acted correctly in precluding the assignment. I'm not saying that they acted correctly. I'm saying they acted within their authority. Okay. But it comes down... Can I ask you a couple of questions, please? Paragraph 10, it says... Paragraph 10 of... The complaint. Rain and hail agreed to purchase certain of acceptances assets. What were the assets? Again, it's in force crop insurance policy and other certain... In other words, they agreed to purchase policies issued by American growers, right? That's correct, Your Honor. Okay. That was my first question. Second question is... Although structured as a sale of assets... This is paragraph 11. Yes, Your Honor. The proposed transaction was in fact a sale by acceptance of its wholly owned subsidiary. Why was that the case? Because they're... Were they selling the company? Well, I mean, there are any number of ways that one would structure it. American growers has... Is an insurance company. It issues policies, right? That's correct. Okay. And you've just said that what was going to be sold were the policies, okay? How does that amount to a sale of the company? American growers was disposing of an asset that it had, namely the policies, but how was American growers itself being sold? Because there were other assets being included in the transaction other than the enforced policies. So basically, was Rain Hale going to get all the stock of American growers? No. They elected not to do it as a stock transfer, Your Honor. So all they were getting were the policies, right? And other insurance assets. What other assets? What does that mean? There were other assets involved in the proposed sale. But what other assets?  The... Like buildings and furniture? Yes. I mean, there were other assets. So basically, it was a sale of American... You're saying acceptance was selling its subsidiary, American growers, right? More or less, yes. Okay. Now, how was the sale to take place? Was there going to be a closing? Rain and Hale had agreed to pay no less than $21.5 million in cash for the purchase of the assets. Okay. Final question. Paragraph 24 of the complaint says, when RMA rejected the proposed Rain and Hale acceptance transaction, it affected a taking, okay? When it rejected the sale, what it rejected at that point was a transaction, a proposed transaction, correct? At that point, yes. What it said is, we are not going to approve the transaction. So it exercised its regulatory oversight and authority in rejecting the proposed transaction. So what was taken at that point was, immediately from the rejection, was the right to sell, correct? Combined with, then, the redistribution of those processes. Well, but that was an effect down the road. But what was it... Wait a minute. They were combined. What do you mean they were combined? The government knew... The federal government didn't have anything to do with what the state of Nebraska did. I disagree, Your Honor. They knew exactly what was going to happen. They were in constant contact. And we should have the right, frankly, to introduce those facts, to show that causal connection, which we have not yet had the opportunity to do. Are you suggesting there was some sort of a conspiracy? I'm not alleging a conspiracy, Your Honor. There are no strawberries in the cabinets here. But what I am suggesting is that there was actual knowledge, that the government knew exactly what was going to happen. It took this action with knowing that the consequences would be that the policies would be redistributed. Mr. Murray, can I ask you one point? The government frustrated one non-binding contract. You still held the policies and could have sold them to someone else who was willing to meet the government's requirements, right? At that point, we could not do that. You still held them. The government frustrated one event.  That's not correct, Your Honor. We could not have done that. What prohibited you from doing that? Did the government say, and you shall not sell to anyone else? At that point in time, they stopped reinsuring the contracts. They knew immediately, because of communication they had with the Nebraska Department of Insurance, that acceptance would be put, American gurus would be put into receivership and ultimately liquidation. Those things happened immediately, one right after the other. And the government knew, based upon the testimony of both the government's officials. But in theory, the minute the rain and hail fell through, you could have walked across the street to Storm and Thunder and sold them the contract, right? I disagree, Your Honor. It could not have happened. There's nothing that would have stopped that? I believe that the sequence of events, given when they happened, how they happened, and the causal connection between the two, would have prevented that from happening. Let me follow up on Judge Rader's question. It may or may not be relevant, but I've been reading up in preparation, there's a very interesting case. This is the first crop insurance case I've ever seen, so I've been doing some background reading. I had no idea what the whole history of that industry was. But in light of the congressional hearings that talk about the fact that the insurance companies get 40% of the dollars and only 60% ever goes into any of the beneficiaries of these contracts, it may or may not be relevant. How did your company get itself into the financial straits that prevented it from being able to go ahead and make a deal with some other company, some other purchaser? Again, Your Honor, I think that there are no facts in the record right now that discuss that issue. I think there were myriad facts that contributed to a one-time third quarter loss that impaired the capital of the company on a short-term basis. It's mentioned in the record. That's correct. Well, it's mentioned in the briefs, Your Honor. Yes, it's mentioned in the briefs. But again, as far as the detail behind that... Okay. My other question is coming back to the First Amendment complaint, A21, paragraph 7. You make the statement that American Growers was in the business of underwriting a substantial number of insurance policies within the Federal Crop Insurance Program. What do you mean by underwriting? Do you mean issuing? That's correct, Your Honor. So you're not underwriting. You're issuing. That's correct. I mean, there is an underwriting process that takes place, but issuing... Okay. Fine. I thought maybe there was yet something else that you were aware of. Fine. Thank you. Judge? Just one final question. Going back to paragraph 24, let's assume for the moment that American Growers had not been in the financial difficulties that we know existed, although we don't know the details, and assume that all that happened here was you had a healthy company, acceptance wanted to sell it to Rain and Hail, but RMA said, no, we are not going to allow the transaction to go forward. I assume at that point, you would say that what was taken, if anything, was the right to sell, correct? But nothing more. At that point, Your Honor, I think we would have to look at this from a Penn Central perspective  But the object of what was supposedly taken at that point was the right to sell. At that point, I think that you are correct, Your Honor, but again, I think we would have to look at it from the perspective of assessing whether Penn Central, the factors enumerated in Penn Central, would dictate the outcome there being a regulatory taking. Okay. But again, the important and the critical point in this is that it was not only the policies which took place at the same time. Which was a consequence of the blocking. Thank you, Mr. Wiener. You have been interested in the court a great deal. You can feel confident about that. Your Honor, I believe I have exhausted my time. We have been over it by quite a bit. Let's give you three additional minutes on rebuttal, and if you could give an additional six minutes to Mr. McConnell, we would be pretty close to even. Thank you, Your Honor. If you need to use them, Mr. McConnell, you may not. Good morning. Good morning. May I please report? This case does not meet the requirements for a categorical regulatory taking. In addition to Omnia... It's not at issue. Pardon me? It's not... The categorical regulatory taking is not at issue under the Lucas case. He's arguing this is at Penn Central, but we're not even getting there. Question is, what is his property interest? Well, okay. I would just mention then that they say six times in their brief that this is a categorical taking. But the answer to your question, though, is that there was no property that was taken. The trial court correctly relied upon Mitchell Arms and the regulated industry line of cases. However, the point I'd like to make, though, is that this is a stronger case for the government than those cases because the company has to make not one, but two voluntary decisions here. It agrees to... It makes a decision to enter the crop insurance industry in the first place, but it can sell crop insurance and not buy reinsurance from the government. So it has to make this... So it's not like... That would be the case. If they had sold crop insurance, if they had... It's a three-party deal here, but let's assume it was only a two-party deal. That is, insurance goes and says to farmers, we'll pay you if you have a crop loss. The farmer says, fine, here, I'll give you a premium. Would RMA have had authority to preclude the transfer of those policies to rain and hail? You mean if they're not getting reinsurance from the federal property? If they're getting no reinsurance? No. No, if they're not getting reinsurance, there's no authority to bar that sale. So it's the government's view that because insurance went to the government and said, we want reinsurance, deal with you, government, that's what gave the government the hook to by acceptance, right? Essentially correct. I mean, we don't agree that our authority is as broad as what they're alleging, but right. It is that second voluntary decision to enter into a contract with the agency in which the company voluntarily agrees to accept the benefits of the programs, but also as any party to a bilateral contract, it also agrees to give something up. It agrees to abide by the provisions of the program. So when the government... And that's all spelled out in the standard reassurance agreement. Correct. Which we don't have a copy, but go ahead. So I mean, acceptance should not be heard to complain of a taking any more than any other party to a contract with the government where the government enforces its rights under the contract. Did they bring an APA action to challenge the government's action? They did not. They did not. Okay. Go ahead. And by the way, the only other litigation here was they initially sued rain and hail, but that lawsuit was dropped. The trial court also, in our view, correctly relied upon the Mitchell Arms line of cases for determining that acceptance does not have a Fifth Amendment protected property right in selling the crop insurance policies to rain and hail. As the court correctly said, that is merely a collateral interest. McCollum, let me ask you, would you agree that in looking at paragraph 24 that what immediately if anything was taken, and I'm not saying there was a taking, but when the was deprived of at that time, if anything, was the ability to make this sale, correct? Yes. Okay. You would agree with that? Yes. Okay. So, and at that point in time, they still owned the insurance policies and they could  That there was an understanding on the part of the government that the taking of this action would equate to a taking of those policies because a irrevocable chain of events was already in place and that you were part of that chain, and even suggests you may be orchestrating that chain. Well, I mean, what was said before was that there was no conspiracy, but what we say in our brief is that there's no allegation here that the state of Nebraska, State Department of Insurance is an agent of the federal government, and previous takings cases within the past 10 years when a state has taken action and it was not an agent of the federal government, the court has refused to hold the government liable for a taking because that state is not an agent of the government. Does he deserve a chance to try and prove that connection, however, that somehow the state of Nebraska may have been acting as an alter ego of the federal government? There may have been some chain of action here? No, Your Honor. I mean, as Mr. Weiner said, we're six years into this case. They were allowed to amend their complaint once already. This complaint doesn't say anything about what the state of Nebraska did. The court gave them the benefit of the doubt in opposing our motion to dismiss and bringing this in, and the court said, well, even taking into consideration everything you've said about the state of Nebraska, there still isn't a taking here under omnia in Mitchell Arms and the other cases, so they shouldn't be able to now come up here on an appeal and raise this at oral argument. So no, I would strongly disagree with that statement, Your Honor. You said something very interesting a couple of minutes ago, Mr. O'Connell. Let me go back to it. You said that what RMA did was take from, if they took anything, they took acceptance's right to sell its contract interest in those policies, right? Essentially, yes. Isn't that a property interest? Doesn't an owner of property ordinarily have as one of the sticks in the bundle of rights the right to sell, to alienate? That's a stick in a bundle of rights, but what the court said under Mitchell Arms is that, and Mitchell Arms, let's not forget, that was a much broader ban than what's alleged here. The plaintiff in that case was banned from selling rifles to anybody in the whole United States. Here we have a much narrower bar in that we're only alleged to have barred one sale to one particular party. This court said in Mitchell Arms that that is not a Fifth Amendment protected property interest. It's a collateral interest. I never understood what a collateral interest was, but it's okay. I accept that. By the way, since we're on that point, your brief refers to strands in the bundle of rights, and that puzzled me because I don't want to be pedantic about this, but I have here the original sticks that came over in 1066 as part of the bundle of property rights, and we've always referred to them as sticks. Let me give you an example of a stick. I've never heard them referred to as strands, so I just wanted you to understand that there is a distinction because these sticks are very important to us property lawyers. Now, come back to the property interest in this case. I would have thought your answer might have been the government's exercise of its right under the SRA, that's your case, your argument from earlier, its right to disapprove the transfer did not take their right to alienate because the government, by prior agreement with them, had the authority to approve or disapprove it, and so they had given up that stick in their bundle, and therefore there was no taking of any property right as such that they owned at that time. Isn't that basically what your case is? That is the case. Which then ties back into where did the government get the right to supervise their alienation of those contract rights, and I don't see anything in any of the briefing that ever explains that. Okay. Well, to answer the first part, I'm trying to deal with this in a 12 v. 6 situation. Exactly. You have to take their, and that also raised an interesting question. Your brief starts out with a counterstatement of fact, which hardly seems appropriate in view of the fact that the issue is not fact. The issue is their complaint. But put that aside for the moment. How do you, where are we supposed to make out of this? Okay. Well, the sole authority that the government has comes from Section 507C of the Federal Crop Insurance Corporation. And it says that the Federal Crop Insurance Corporation shall give policyholders the right to choose their, I'm paraphrasing, but to choose their insurance company and renew with that insurance company. So the authority through the contract that the agency has is to make sure that it's the policyholders' explicit consent that a policy cannot be transferred from company A to company B. In other words, Rain and Hail can't just show up, this is November of 2002, keep in mind, so that when Farmer Jones is planting the wheat crop in the spring, Rain and Hail can't just show up and say, we're your insurance company. The farmer has to sign off on the cancellation of the policy with American growers and with the new policy with Rain and Hail. So to answer your question, the rights flow from 7 U.S.C. 1507C. But the farmers were never involved in this whole transaction? We never got that far right. What is the basis of the authority for RMA to bless or not bless this proposed sale? What is the statutory or regulatory authority for that? That was an extensive part of our briefing at the Court of Federal Claims is that we don't have this authority. So in addition to operating this 12B6 world, we're kind of operating... We don't have the authority. We don't have the authority to just say, well, we think it's a good idea that if these policies are sold from acceptance to Rain and Hail, we don't have that authority. And we said, we told the Court of Federal Claims we didn't, but the Court of Federal Claims... You mean to tell me that you're saying they didn't have to refuse, Rain and Hail did not have to refuse to go ahead with the deal because acceptance couldn't transfer it because RMA had said they didn't? No. They don't have to get our acceptance. They don't have to get our approval if they don't want reinsurance. And they don't have to get our approval if they're going to abide by the terms of the contract. The reason why we got involved was they wanted the government to waive some provisions of the contract. Mr. Wiener said, I think when he was at the podium, he said that while he disagreed with what RMA did, RMA was acting within the scope of its authority. I think that's what he said. Now, what was the scope of that authority here? In other words, just tell us, Mr. O'Connell, what was RMA authorized to do when acceptance slash American growers came to it with respect to this Rain and Hail transaction, the proposed transaction? Its authority is the provision of the contract that's attached to our brief, and that there's a provision of the contract which requires the assuming insurance provider must complete and have the insured sign a cancellation transfer of experience data form. In other words, you're buying 300,000 insurance policies. You've got to go out and get every farmer sign a form, which is something that they didn't want to do. They wanted us to waive that. So if they had gone out and done that, then they can go out and do the deal. Is that specific provision again in Section 4? It's Supplemental Appendix, Page 1. It's Paragraph C9B, Requirements, which is the assuming insurance provider must complete and have the insured sign a cancellation transfer of experience data form for each policy crop being transferred. Well, it's fundamental contract law that a promisor cannot transfer its duties without the permission of the promisee, and that's fundamental contract law. That is, an insurance company can't simply transfer its obligations to the insured to some drunk down the street and say, oh, I've transferred my duties, Mr. Insurer. Sorry if you don't get any money back when you have a loss. It's basic contract law. You can't do that, right? So is that what you're telling us? Is that what this provision requires? Well, I mean, yes, but yes. Did RMA have authority to allow acceptance slash American growers not to have to do that to get the permission of all the farmers? Yes, they did have the authority to waive the provision, yes. To let the American growers off the hook of that provision? Right, when it would actually be letting rain and hail off the hook. I mean, rain and hail had its own standard reinsurance agreement with the government, but I mean, we're getting beyond the record a little bit, obviously, but I mean, what rain and hail wanted was to change that provision from an opt-in, where you have to sign off and say, I want insurance from rain and hail, to an opt-out. In other words, send the farmer a notice saying, we're going to be your new insurance company unless you tell us otherwise. And the government wouldn't go along with that? Is that what you're saying? Well, there was some give and take in these negotiations, and this is part of why the negotiations never ripened into a binding contract. And that lack of a binding contract, in our view, is what distinguishes this case from the Omnia line of cases and makes this a stronger case for the government. So, it's our view that the trial court relied jointly upon Omnia in the Mitchell Arms line of cases to hold that the claim was barred. See, counsel, the problem, at least speaking for myself, the problem in this case is not whether there was a taking, because we've never gotten there. That issue, even if we held for them on this appeal, after two appeals, we never have gotten to the question of whether there was an actual taking. The question that we're wrestling with now is, did they have a property interest that got interfered with? Did they allege? The issue isn't even whether they actually had a property interest, is it? The question is whether they allege the existence of a property interest in a well-pleaded complaint that would entitle them to something other than a 12B6 motion throwing them out. And the government's position on that is? That they don't have a property interest protected under the Fifth Amendment, so it was proper for the court to rely on Mitchell Arms and Omnia. And the reason they don't have a property interest is because they didn't have a basic stick in their bundle that entitled them to sell their contract rights to rain and hail. Correct. Why not? Well, because under Mitchell Arms, Mitchell Arms says that the government could bar you from selling your product to all 300 million people in the United States. If we're only barring them from selling to one company, then this seemingly to us is a much easier case for the court than Mitchell Arms because the bar is so, so much narrower. So they could have sold to someone else who would meet your conditions. Is there ever an issue that you put so many conditions that it in effect blocks their ability to sell? Well... In other words, that sounds like a regulatory taking scenario, that your conditions are so high as to be an absolute bar. I mean, I believe there are cases that discuss things like that, but we don't have... But that isn't even alleged here, is what you're saying. Correct. All right. So I'd ask the court to affirm the decision of the Court of Federal Claims. Thank you. Thank you, Mr. O'Connell. Well, Mr. Wiener, I think we gave you three minutes. Thank you, Your Honor.  Mr. Wiener, one question. Yes, sir. Do you agree with Mr. O'Connell's statement as to the basis for the government's authority to act here? I realize you say the government acted wrongly, but I think you did say that it acted within its authority. Yes, under Florida Rock, Fifth Amendment taking can only be predicated upon authorized government actions. But what was the authority here? I mean, what gave the government the right to do what it did here, even though you say it acted wrongly? Again, it's plenary right to regulate the crop insurance industry. And where does that come from? Again, Section 6933 of the Federal Crop Insurance Act. And what's the statutory provision? I can get it to you. Is it 7 U.S.C.? I believe it is, Your Honor. Yes. And what about what, 6933? Yes, that's correct, Your Honor. And what about the point that Mr. O'Connell is making about Section 4 of the agreement? He said that that was the basis for the governmental action here. Again, Your Honor, I disagree. That section is inapplicable. It applies when the insured wants to transfer his policy, does not contemplate the situation. So you're saying the government had the right to act here, but rather under the statute, not under Section 4? It's not a contract case. But if the government had the authority to block your right to sell, and you can see they had authority to block your right to sell under these circumstances, to sell your property, which I'm prepared to identify as the right to transfer your contract rights to somebody else, then I don't understand how you can say that they took something from you if they had the legal right to make that decision. They have the right to regulate, as does any executive branch agency, but under Pennsylvania Cole, when regulation goes too far, then it can constitute a taking. And we think they went too far here because they took my client's private property interest for the public good. They were trying to avoid litigation, their own decision-making. But it cuts to the chase, Your Honor. This is the point. We should have the opportunity to make the case. There are material issues of fact and dispute in this case. Does Section 4 of the SRA apply? We believe it does not. The government believes it does. It's a material issue of fact and dispute. At the end of the day, the lower court didn't apply the right standard. You stated the standard correctly, Your Honor. Have we alleged a taking? Have we properly alleged a taking? And nowhere in the court's order does it assess the elements of the complaint. What it does is it says plaintiff has not demonstrated that it is a protected property right. We haven't gotten to the evidentiary stage yet. The court concluded that because we operated in a regulated environment, our possibility of a takings claim is extinguished. It's the wrong standard, Your Honor. The court failed to apply the Rule 12 standard in dismissing this case. We should have rather it apply to Rule 56 standard without giving us the opportunity to present our case on the facts. Thank you, Mr. Weiner. Thank you, Your Honor. I think our time has expired. Let's go on to our last case today.